# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

MICKY DON OWENS,

   Plaintiff,

   v.             Case No. 18-3239-JWB-GEB

FINNEY COUNTY, KANSAS, et al.,

   Defendants.

## MEMORANDUM AND ORDER

   This pro se, 42 U.S.C. § 1983 action arises from alleged mistreatment that Plaintiff Micky Don

Owens endured while detained in the Finney County Jail awaiting trial.  Plaintiff claims Defendants

refused him adequate medical care, used excessive force against him, and denied him access to the courts

and counsel.  Defendants move for dismissal under 28 U.S.C. § 1915A(b) and Fed. R. Civ. P. 12(b)(6),

arguing that Plaintiff's complaint and uncontroverted facts established in the *Martinez* report ordered by

this court show that Plaintiff states no nonfrivolous claims upon which relief can be granted. (Doc. 21.)

For the reasons that follow, Defendants' motion is DENIED in part and GRANTED in part.

## I.  Factual and Procedural History[1]

   From May 2018 to October 2019, Plaintiff was detained in the Finney County Jail ("FCJ").

During this time, Defendant Finney County, Kansas, funded the jail.  Other Defendants staffed or

---

[1] The court takes the following facts from: the well-pleaded allegations in Plaintiff's complaint; Plaintiff's response to the *Martinez* report, even though not a sworn statement; and the *Martinez* report itself, when not "in conflict with" Plaintiff's other nonconclusory factual allegations. *Hall v. Bellmon*, 935 F.2d 1106, 1109–10, 1112–13 (10th Cir. 1991).  In fact, Plaintiff's response to the *Martinez* report "begs the court to use the provable information included in the *Martinez Report*"—information like: Plaintiff's "medical records;" "written requests;" and, given the reliance Plaintiff's response places on them, certain of the Finney County Jail's written policies. (Doc 25 at 3–4.)

oversaw the jail, including: Finney County Sheriff Kevin Bascue; FCJ Administrator Mark Welch; FCJ Lieutenant Kyle Lawson; and Michelle Newsome, the FCJ's nurse.

The FCJ generally addresses inmate medical concerns using one of two procedures. Since the material facts in this case require an understanding of those procedures, they will be the starting point for this discussion.

One set of procedures applies to medical emergencies. "Any medical emergency," according to the FCJ's inmate handbook, "should be communicated to the housing Deputy immediately so that proper medical attention can be provided." (Doc. 20-1 at 11.) The deputy discovering the medical emergency then calls for a supervisor's assistance. While awaiting the supervisor, the deputy gathers information on and monitors the inmate's condition. When the supervisor arrives, the deputy briefs the supervisor, who then determines whether the medical emergency is life threatening or non-life threatening. If the supervisor determines the inmate may die if not promptly treated, EMS is dispatched. If however, the inmate's condition "usually does not lead to death but needs to be treated as soon as possible," arrangements are made for FCJ staff to transport the inmate to receive medical care. (*Id.* at 35.)

Outside of a medical emergency, inmates request medical attention by completing a non-emergency medical request form ("NEF"). The NEF is one of two request forms used by the jail. An alternative form, the inmate communication form ("ICF"), allows inmates to lodge appeals, grievances, or nonmedical requests. But inmates making medical requests through an ICF misuse the ICF and are instructed to rewrite their request on an NEF. A jail deputy who receives a properly completed NEF then places the form in the FCJ mailbox belonging to the nurse assigned to the jail.

Defendant Newsome oversaw inmate medical care as the FCJ's only nurse, at least throughout Plaintiff's detention. Though available during off-duty hours to field questions, Newsome ordinarily worked normal business hours Monday through Friday. She also split her workdays, working

approximately 70% of her day at the FCJ and the other 30% at a nearby juvenile detention center. Newsome normally checked her FCJ mailbox when she first arrived. She then triaged any submitted NEFs with an aim to responding to all NEFs within 48–72 hours. FCJ staff then deferred to any medical judgments and provided for any prescribed care that attended her response.

During his detention at FCJ, Plaintiff made numerous requests for medical care. Between May 9 and September 7, 2018, Plaintiff made "several oral and written requests to be seen by medical staff for serious mental health issues, such as Manic Depressive Disorder, Paranoia, and hallucinations, plus suicidal and homicidal ideation." (Doc. 1 at 4.) Newsome allegedly "ignor[ed]" these unspecified requests. (*Id.*) Yet, Plaintiff received some attention.

By either NEF or ICF, Plaintiff requested treatment for his mental health on May 31; June 18; July 12, 13, and 16; and September 13, 2018. On May 31, Plaintiff requested by NEF "to see a mental health professional at the <u>EARLIEST possible</u> opportunity." (Doc. 20-3 at 39 (emphasis in original).) Newsome responded that she would schedule Plaintiff an appointment to "talk to the representative from Compass"—the FCJ's mental health provider. (*Id.*) On June 18, Plaintiff requested by ICF "to see Mental Health immediately," expressing that he was "miserable to the point of contemplating" harm to others or himself. (Doc. 20-2 at 20.) In response, Plaintiff was placed in a booking cell for closer observation under a 15-minute watch. (*Id.* at 14.) FCJ staff transported Plaintiff to meet with Compass on July 12. The attending physician prescribed Plaintiff new medication and scheduled a follow-up appointment one month out. (Doc. 20-3 at 18.) That same day, the "second consecutive day without" his prescribed "pscyh meds," Plaintiff requested by NEF that he receive his medication. (*Id.* at 42.) Newsome responded: "We have no control over the pharmacy's delivery schedule. Please be patient. Once they arrive[,] we will get you set up." (*Id.*) The next day, on July 13, Plaintiff renewed his medication request by an ICF demanding an inquiry into "this negligence." (Doc. 20-2 at 25; *see also*

*id.* at 9.)  Consistent with FCJ policy, jail staff advised Plaintiff to restate his request on an NEF. (*Id.* at 25.)  The following day, July 14, Plaintiff orally requested that someone go "pick up his meds from Dillons pharmacy.  He was informed [that FCJ staff] don't pick up meds, they are delivered to [FCJ]." (*Id.* at 9.)  On July 16, Owens noted in an ICF, "I want my psychiatrist prescribed . . . medications to be picked up from the pharmacy and put on the med cart within 48 hours of them being called in." (*Id.* at 29.)  Plaintiff attended follow-up appointments with Compass on August 9 and September 12. (Doc. 20-3 at 19, 31.)  On September 13, Plaintiff submitted an NEF requesting a refill of his "mental health meds" as they "run out tomorrow." (*Id.* at 50.)  Newsome wrote back to Plaintiff: "Meds were called in from Compass to the Pharmacy following med review on 9-12-18.  Awaiting delivery." (*Id.*)

Issues outside of his mental well-being also concerned Plaintiff. On multiple occasions between July 13–16, 2018 (the same weekend he was lodging various complaints about his mental health medications), Plaintiff informed various FCJ staff that "he was suffering severe pain from what he believed to be a MRSA infection." (Doc. 1 at 5.)  He described the infection as "dangerous and, if left untreated, . . . potentially life-threatening." (*Id.*; *see also* Doc. 20-2 at 29 (stating similar allegations in July 16, 2018 ICF).)  Plaintiff put some of these entreaties in writing.  In a July 13 NEF, he requested "emergency aid & treatment" for "a large & painful infection on both of [his] rear[-] end cheeks." (Doc. 20-3 at 43; *see also* Doc. 20-2 at 9.)  Plaintiff's NEF included among his symptoms: "blood & pus secretions, severe headaches, high blood pressure, pain in chest right of sternum." (Doc. 20-3 at 43.)  On July 14, Plaintiff asked FCJ staff to visit the nurse for "an infection on his butt that is MRSA." (Doc. 20-2 at 9.)  To the on-duty FCJ staff who "took a look at [Plaintiff's buttocks,] . . . it seem[ed] like [Plaintiff had] either an ingrown hair or a pimple." (*Id.*)  On July 15, Plaintiff used an ICF to request "towel and [anti-bacterial] soap" to wash "the MRSA infections [he's] dealing with." (*Id.* at 26.)  And a July 16 ICF also noted Plaintiff's desire that "the MRSA infection . . . on [his] backside . . . be treated before [he]

get[s] blood poisoning." (*Id.* at 28–29.) According to Plaintiff, the FCJ staff who spoke with him about these requests were "untrained and unqualified . . . to inspect [Plaintiff's] infection." (*Id.* at 29; *see also* Doc. 1 at 5.) Nevertheless, Plaintiff alleges that Newsome effectively "delegated" them that exact task when she "refused to see Plaintiff." (Doc. 1 at 5; *see also* Doc. 20-2 at 29.)

Despite this unsupported verbiage implying willful conduct on Newsome's part, it is unclear from Plaintiff's complaint when Newsome learned of Plaintiff's condition. The weekend may have put some distance between Plaintiff and Newsome. July 13 was a Friday, the last day of Newsome's workweek. Newsome, therefore, may not have seen Plaintiff's July 13 NEF until she, as she normally did, checked her mailbox upon arrival at FCJ the following Monday, July 16. At that point, in any event, Newsome responded to Plaintiff's request and directed FCJ staff to take Plaintiff to the hospital.[2] (Doc. 20-3 at 43.) There, Plaintiff's abscess was surgically removed through a "three-inch deep incision." (Doc. 1 at 6; *see also* Doc. 20-2 at 30.) A culture from the abscess tested positive for MRSA. Plaintiff was discharged with a prescription for antibiotics, orders to take Tylenol and ibuprofen as needed, and instructions that FCJ staff "[r]e-pack the wound daily" and provide Plaintiff "antibacterial soap and clean towels." (Doc. 20-3 at 8–9.)

Also over that weekend preceding Plaintiff's July 16 hospital visit—late evening on July 14, specifically— Plaintiff involved himself in a disturbance. "[O]nly drastic measures would get me the emergency medical treatment I need," Plaintiff allegedly thought. (Doc. 20-2 at 27.) So, he went around "closing a number of cell doors without permission." (Doc. 1 at 4; *see also* Doc. 20-2 at 4.) Doing so,

---

[2] Newsome claims also to have seen Plaintiff prior to sending him to the ER. Plaintiff, however, directly contradicts this particular fact with the allegation that "Newsome refused to see Plaintiff until after he'd been taken to the Emergency Room on 7-16-2018." (Doc. 1 at 5.) At this stage, Plaintiff's allegation deserves this court's credit. *Gallagher v. Shelton*, 587 F.3d 1063, 1067 n.7 (10th Cir. 2009) ("The *Martinez* report may not be used to resolve disputed factual issues."). Because Plaintiff does not specifically controvert the fact that Newsome directed that he be taken to the ER, however, the court takes that fact as true. *Maberry v. Stotts*, No. 93-3181, 1994 WL 47164, at *2 (10th Cir. Feb. 17, 1994) ("Any facts set forth in the *Martinez* report that plaintiff does not controvert may be treated as part of plaintiff's complaint. . . .").

he prevented other inmates from entering their cells. He and some of those other inmates then refused multiple orders to lockdown. As FCJ staff attempted to unlock cell doors to allow lockdown, he and other inmates continued shutting doors and refusing orders. They then started overturning tables and chairs to form a makeshift barrier between themselves and FCJ staff. Plaintiff's noncompliance eventually led to him being "thoroughly maced with pepper spray." (Doc. 1 at 4; *see also* Doc. 20-2 at 17–19.) When no submission followed, Plaintiff found a taser pointed at himself. At that point, Plaintiff "peacefully locked himself down." (Doc. 1 at 4.)

An hour later, Plaintiff made his first request "to be allowed to disinfect and relieve the burning" from the pepper spray. (Doc. 25 at 2.) By then, FCJ staff had removed Plaintiff to a segregation cell. There, to decontaminate, Plaintiff was allowed dish soap, access to water from the cell's sink, and a new set of clothes. Plaintiff used these items. Despite "multiple" requests, (Doc. 1 at 6), however, FCJ staff denied Plaintiff the opportunity to shower until "[o]ver 40 hours passed." (Doc. 25 at 2.)

For his part in the July 14 disturbance, Plaintiff pled guilty to a major violation and received a penalty of 30-days disciplinary segregation. Disciplinary segregation came with certain restrictions. One hour per day Plaintiff was permitted to read legal mail, complete legal paperwork, or write letters. But he could do so with the aid of only those commissary items (including paper, envelopes, postage, or other correspondence materials) he had purchased prior to segregation. For much of the day, moreover, everything but "a Bible and a roll of toilet paper" was removed from his cell. (Doc. 25 at 2.)

Plaintiff complained about these restrictions through various ICFs. On July 15, Plaintiff represented that he was "proceeding 'Pro Se' in a judicial matter" and prospectively requested that he "be allowed to keep" with him correspondence materials and legal documents. (Doc. 20-2 at 26.) On July 16, Plaintiff noted his mattress was being taken daily despite his buttock's "large infection." (*Id.* at 29.) On July 18, following Plaintiff's return from the hospital, Plaintiff again complained that he was

enduring "needless and avoidable pain" because, during the day, FCJ staff "refused . . . [him] anything to cushion" the "deep incision on [his] rear." (*Id.* at 30.)  On July 19 and 20, Plaintiff made additional requests for "correspondence items" or a change in the FCJ's commissary-restriction policy. (*Id.* at 31–32.)  On July 22, Plaintiff clarified that he was not representing himself in his criminal case but instead intended to represent himself in a "filing . . . to seek relief for violations of [his] Civil Rights;" he also asked FCJ staff to "schedule [him] a 15[-]minute call to [his] Power-of-Attorney." (*Id.* at 33.)  And on July 31, Plaintiff asked FCJ staff whether, using his own funds, they "could provide postage and mail" a "form [he] received from the Clerk of the U.S. District Court in Topeka"; he also complained that FCJ staff often returned his cell's mattress to him at unpredictable and late times, spanning from 10:30 to midnight. (*Id.* at 35.)  None of Plaintiff's requests were met.  This deprivation effectively prevented Plaintiff "from placing calls to his defense attorney, and from purchasing correspondence materials necessary to communicate with the courts and attorneys." (Doc. 1 at 7.)  And without a mattress or cushion during the day, Plaintiff experienced "intense pain when sitting on any hard surface." (*Id.* at 6.)

Plaintiff complained about that pain also to Newsome directly.  From July 17 to July 30, Newsome daily changed Plaintiff's abscess wound packaging.  Throughout these visits, she observed that Plaintiff's wound was "healing well" with "no complications." (Doc. 20-3 at 15–16.)  Still, Plaintiff explained to Newsome that the FCJ's disciplinary segregation policy caused him "to have to sit or lay on a metal slab . . . for an extended period of time each day."[3] (Doc. 25 at 3.)  No offer of a mattress or padding was made following this complaint.  In fact, due to the location of Plaintiff's wound and the fact

---

[3] Newsome claims never to have received from Plaintiff any complaints of pain while sitting or requests for a cushion, mattress, or other padding. (Doc. 20-3 at 3.)  Plaintiff, however, directly contradicts this particular fact. (*See* Doc. 25 at 3.)  At this stage, the court accepts Plaintiff's allegation. *Gallagher*, 587 F.3d at 1067 n.7.  Because Plaintiff does not specifically controvert the fact that Newsome "would have denied [any such] request as medically unnecessary," (Doc. 20-3 at 3), however, the court takes that fact as true. *Maberry*, 1994 WL 47164, at *2.

that prolonged sitting would impede the wound's healing, Newsome regarded Plaintiff's request as medically unnecessary.

Another MRSA infection pained Plaintiff in late August 2018. On August 20, Plaintiff submitted an NEF requesting "one more round of antibiotics" for "another" but "less serious than the last" MRSA infection on his forearm. (Doc. 20-3 at 44.) Again, Newsome "refused to see Plaintiff."[4] (Doc. 1 at 5.) But she did notify an APRN (Advanced Practice Registered Nurse) of Plaintiff's complaint, to obtain "further orders" on antibiotics. (Doc. 20-3 at 44.) Before those antibiotics could arrive, on August 23, Plaintiff complained to FCJ staff that "the rash he has on his arm and buttocks was now spidering towards his chest and down his arm." (*Id.* at 21.) FCJ staff transported Plaintiff to the hospital. There, his arm was diagnosed to have an abscess, for which he was ultimately prescribed antibiotics and discharged. When Plaintiff later had an allergic reaction to those prescribed antibiotics, Newsome obtained a new antibiotic prescription to treat Plaintiff's abscess and Benadryl and antibiotic ointment to treat Plaintiff's hives and blisters.

Plaintiff filed this suit on September 14, 2018. In addition to the five Defendants already mentioned, Plaintiff's complaint named the FCJ itself. Judge Sam A. Crow preliminarily reviewed Plaintiff's complaint; dismissed the FCJ as a non-suable entity; and, to facilitate proper screening of Plaintiff's claims, ordered the FCJ to prepare a *Martinez* report. (Doc. 13.) The *Martinez* report was filed June 3, 2019. (Doc. 20.) One month later, Defendants moved to dismiss Plaintiff's claims as

---

[4] Again, Plaintiff's allegation that "Newsome refused to see Plaintiff until after he'd been taken to the Emergency Room on . . . 8-24-2018" directly contradicts *Martinez* report evidence tending to show that Newsome, in fact, saw Plaintiff following his August 20 NEF. (*Compare* Doc. 1 at 5 *with* Doc. 20-3 at 44 (stating that Newsome saw Plaintiff; observed a "[r]ed spot on [his right] forearm, raised and warm to [the] touch;" and "[b]ased on [Plaintiff's] previous [diagnosis] of MRSA," she then decided to seek "further orders" from Plaintiff's APRN).) And so, at this stage, the court credits Plaintiff's allegation. *See Gallagher*, 587 F.3d at 1067 n.7. Plaintiff's allegation and his response to the *Martinez* report, however, fail to controvert the specific fact that Newsome responded to Plaintiff's NEF by seeking another medical professional's treatment advice. So, this court takes that fact as true. *Maberry*, 1994 WL 47164, at *2.

-8-

frivolous under 28 U.S.C. § 1915A, or, alternatively, for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). (Doc. 21.)  In separate filings, Plaintiff responded both to Defendants' motion and to the *Martinez* report. (Docs. 23 and 25.)  Defendants' motion, therefore, has ripened for decision.

## II.    Standard

Title 28 U.S.C. § 1915A(b)(1) and Fed. R. Civ. P. 12(b)(6) empower this court to dismiss any portion of Plaintiff's complaint that fails to state a claim upon which relief may be granted.[5] *See also Kay v. Bemis*, 500 F.3d 1214, 1217 (10th Cir. 2007).  Plaintiff's complaint must allege facts that "raise a right to relief above the speculative level." *Id.* (quoting *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 555 (2007)).  The court construes Plaintiff's pro se complaint "liberally," scrutinizing it "less stringent[ly]" than it would a lawyer-drafted pleading. *Hall*, 935 F.2d at 1110.  Even so, "the court need accept as true only [Plaintiff's] well-pleaded factual contentions, not his conclusory allegations." *Id.*

"Any facts set forth in the *Martinez* report that [P]laintiff does not controvert," moreover, "may be treated as part of [P]laintiff's complaint for purposes of determining whether the complaint . . . fail[s] to state a claim." *Maberry*, 1994 WL 47164, at *2 (citing *Hall*, 935 F.2d at 1112–13).  The court accepts Plaintiff's factual allegations even if "less specific or well-documented than those contained in the [*Martinez*] report." *Hall*, 935 F.2d at 1109.  But a "bona fide factual dispute" requires factual allegations that are actually "in conflict with the *Martinez* report." *Id.*  "[C]onclusory and unsworn allegations" do not suffice to controvert a *Martinez* report's facts. *Barkus v. Kaiser*, No. 00-7044, 2000 WL 1346226, at *2 n.1 (10th Cir. Sept. 19, 2000) ("[Plaintiff] received an opportunity to respond to the *Martinez* Report and his response consisted merely of assertions of perjury and deceit by the state defendants, conclusory

---

[5] Section 1915A(b)(1) also authorizes dismissal of "frivolous" and "malicious" claims.  While Plaintiff's allegations "may not fully state a claim for relief," his claims "certainly have an 'arguable basis in law [and] in fact,'" making them neither frivolous nor malicious. *Maberry*, 1994 WL 47164, at *2 (quoting *Nietzke v. Williams*, 490 U.S. 319, 325 (1989)).

allegations he and others were subjected to discipline by placement in the [objected-to] Phase Program, and identification of individuals he believes can controvert the facts set forth in the report. This is insufficient to show any conflict of facts."). If Plaintiff cannot prevail on the facts established through his complaint and the *Martinez* report, dismissal will result only if "an opportunity to amend" would be futile. *Kay*, 500 F.3d at 1217; *Maberry*, 1994 WL 47164, at *2.

### III.    Analysis

Plaintiff asserts individual and official capacity claims against Defendants, organized into three counts. In Count I, Plaintiff claims all Defendants "were deliberately indifferent to [his] serious medical needs" for care relating to his mental health and MRSA infections. (Doc. 1 at 4–5.) In Count II, Plaintiff claims "[a]ll Defendants, except M. Newsome, . . . inflicted . . . on [him] . . . unnecessary . . . pain" when they refused his post-pepper spray requests for a shower and his post-hospital visit requests for a cushion. (*Id.* at 4, 6.) Whether this court characterizes the treatment Plaintiff received in response to his cushion requests "as inhumane conditions of confinement, failure to attend to his medical needs, or a combination of both," Plaintiff still must satisfy "the 'deliberate indifference' standard articulated in *Estelle* [*v. Gamble*, 429 U.S. 97 (1976)]." *Wilson v. Seiter*, 501 U.S. 294, 303 (1991). Because the use of pepper spray "implicates the use of excessive force," however, its distinct framework—not the deliberate indifference framework—is the "more appropriate," "correct legal standard." *DeSpain v. Uphoff*, 264 F.3d 965, 977–78 (10th Cir. 2001); *see also Redmond v. Crowther*, 882 F.3d 927, 936 (10th Cir. 2018). Plaintiff also characterizes this pepper spray-based claim as "the excessive force claim." (Doc. 25 at 2.) The court, therefore, reframes the issues to consider all MRSA-based claims together under Count I, leaving Plaintiff's pepper spray-based claim in Count II. In Count III, finally, Plaintiff claims "[a]ll Defendants, except Newsome, deprived [him] of his inalienable rights . . . to communicate with the

courts and attorneys." (*Id.* at 7.) Each of Plaintiff's claims have their own dismissal-worthy defects, according to Defendants. The court takes Defendants' arguments in turn.

### A. Count I: Deliberate Indifference to Plaintiff's Mental Health Conditions & MRSA Infections

Plaintiff claims that Defendants deliberately ignored his medical needs. "The Fourteenth Amendment entitles pretrial detainees," like Plaintiff, "to the same standard of medical care owed to convicted inmates under the Eight Amendment." *McCowan v. Morales*, 945 F.3d 1276, 1290 (10th Cir. 2019). Plaintiff pleads a plausible violation under that standard only if he alleges facts showing "deliberate indifference to his serious medical needs." *Estelle*, 429 U.S. at 104; *see also McCowan*, 945 F.3d at 1290. That showing involves an objective prong and a subjective prong. *McCowan*, 945 F.3d at 1290. Defendants accept that Plaintiff's mental health and MRSA conditions likely qualify as "sufficiently serious" medical conditions, thus conceding the objective prong on those claims. (Doc. 21 at 9, 12); *see also McCowan*, 945 F.3d at 1291 ("[t]he objective component of deliberate indifference is met if the harm suffered rises to a level sufficiently serious to be cognizable under the Cruel and Unusual Punishment Clause.").

But Defendants concede nothing on the subjective prong. The subjective prong generally requires "a sufficiently culpable state of mind." *McCowan*, 945 F.3d at 1292. Though sufficient to prove a culpable mind, neither an "intent to harm" nor a belief "that harm actually would befall" Plaintiff is required. *Id.* at 752. Culpability instead turns on whether Defendants "knew about and disregarded a substantial risk of harm to [Plaintiff's] health and safety." *Mata v. Saiz*, 427 F.3d 745, 752 (10th Cir. 2005). Plaintiff must show more than an "inadvertent" or negligent failure to meet his serious medical needs. *Estelle*, 429 U.S. at 105–06. Ultimately, Plaintiff may hold Defendants liable for delaying or refusing him either care (if qualified to evaluate and treat his condition) or access to care (if only a gatekeeper for other medical personnel capable of evaluating or treating his condition), *see Sealock v.*

*Colo.*, 218 F.3d 1205, 1211 (10th Cir. 2000), but only if he also shows that any such delay or refusal occurred despite "knowledge of a substantial risk" that inaction would cause him "unnecessary pain or a worsening of [his] condition." *Mata*, 427 F.3d at 751–52, 755.

### 1. Defendant Newsome—Individual Capacity

Plaintiff alleges that Newsome "ignore[d] several oral and written requests to be seen by medical staff for serious mental health issues, such as Manic Depressive Disorder, Paranoia, and hallucinations, plus suicidal and homicidal ideation." (Doc. 1 at 4.) He further alleges that Newsome "refused to see [him] regarding two separate, serious and potentially life-threatening, not to mention extremely painful, MRSA infections," at least not "until after he'd been taken to the Emergency Room on 7-16-2018 and 8-24-2018." (*Id.* at 4–5.) And then, "Defendants refus[ed] him a mattress or other padding to sit on following his first Emergency Room visit." (*Id.* at 6.) From the face of Plaintiff's complaint, however, the court can determine few if any of the details surrounding Plaintiff's requests or Newsome's conduct. The court gathers that Plaintiff "informed [certain FCJ] officer[s]"—named in Plaintiff's allegations but not named in this suit—"that he was suffering severe pain from what he believed to be a MRSA infection." (*Id.* at 5.) But he otherwise alleges no further facts clarifying: when he made each of his requests; the form and contents of the requests; to whom he presented each request; and, at least as it concerns his mental health-based requests, the consequences that resulted when these requests were ignored. These details might support a plausible claim that Newsome refused Plaintiff access to necessary care with "a sufficiently culpable state of mind." *McCowan*, 945 F.3d at 1292. But without these details, Plaintiff's right to relief remains speculative. *See Kay*, 500 F.3d at 1217 ("[f]actual allegations [in a complaint] must be enough to raise a right to relief above the speculative level.")

Looking outside Plaintiff's complaint to the *Martinez* report's uncontroverted facts and Plaintiff's response, nothing shows that Newsome refused or delayed Plaintiff access to treatment

knowing that her actions would put Plaintiff at a "substantial risk" for "unnecessary pain or a worsening of [his] condition." *Mata*, 427 F.3d at 751–52, 755.

Newsome responded to every NEF Plaintiff submitted requesting treatment for his mental health. When Plaintiff requested on May 31, 2018, "to see a mental health professional," Newsome scheduled Plaintiff "to talk to the representative from Compass that comes to the jail." (Doc. 20-3 at 39.) Plaintiff attended monthly appointments outside the jail with Compass on July 12, August 9, and September 12. When Plaintiff wrote to Newsome on July 12 wanting his medication refilled, Newsome advised that the jail "has no control over the pharmacy's delivery schedule" but that she would get Plaintiff his medication once it arrives. (Doc. 20-3 at 42.) When Plaintiff made the same refill request a month later, Newsome confirmed that Compass had called Plaintiff's prescription in to the pharmacy and advised Plaintiff the jail was "[a]waiting delivery." (*Id.* at 50.) Newsome acted consistent with the FCJ's policy on prescription medication. (*See* Doc. 20-1 at 17 (explaining that the FCJ has a "policy . . . to obtain the appropriate medications from a pharmacy for the inmates" using a procedure whereby designated pharmacies deliver medications to the jail).) She did not deliberately choose to delay Plaintiff access to his prescribed medication. *Cf. Gray v. Sorrels*, 744 F. App'x 563, 570 (10th Cir. 2018) (stating that a doctor's "inability to provide [plaintiff] a knee brace due to a prison spending freeze does not demonstrate deliberate indifference on [the doctor's] part."); *O'Bryan v. Sedgwick Cty.*, No. 98-3308-JTM, 2000 WL 882516, at *6 (D. Kan. June 12, 2000) ("A *deliberate* refusal . . . to provide an inmate with prescribed medication may demonstrate" a "knowing indifference to serious medical needs."). As such, Newsome bears no individual responsibility for any harm resulting from delays caused by the pharmacy.

Newsome also responded to every NEF Plaintiff submitted requesting care for his MRSA infections.

For his first MRSA infection, Plaintiff made a single NEF request on July 13, 2018, for "emergency aid & treatment"—a curious request inasmuch as an NEF is, by definition, intended for non-emergency requests. (Doc. 20-3 at 43.) Again, Plaintiff's complaint provides no nonconclusory factual allegations to show when Newsome actually received this NEF. But uncontroverted facts stated in the *Martinez* report support the reasonable inference that Newsome lacked any awareness of Plaintiff's July 13 NEF until she collected and reviewed the materials from her mailbox the following Monday, on July 16. At that time, Newsome directed FCJ staff to take Plaintiff to others capable of treating his condition, fulfilling her gatekeeper role. These facts show that Newsome's delay in arranging care for Plaintiff's initial MRSA infection was "inadvertent." *Estelle*, 429 U.S. 105–06. Without further well-pleaded allegations from Plaintiff controverting these facts, these facts "may be treated as part of [P]laintiff's complaint." *Maberry*, 1994 WL 47164, at *2.

When Plaintiff returned from the hospital, Newsome daily attended to his wound until healed. Caring for Plaintiff's wound, in Newsome's opinion, did not require her to arrange for Plaintiff any kind of mattress, cushion, or other padding to ease the pain he experienced when sitting while confined in disciplinary segregation. In fact, she believed that prolonged sitting would impede the wound's healing. Though Plaintiff disagrees with this treatment choice, his "disagreement does not give rise to a claim for deliberate indifference to serious medical needs." *Perkins v. Kan. Dep't of Corr.*, 165 F.3d 803, 811 (10th Cir. 1999).

And when a second MRSA infection on Plaintiff's arm caused Plaintiff to submit another NEF on August 20, 2018, requesting antibiotics, Newsome reached out to another medical professional for "further orders" on a new round of antibiotics. (Doc. 20-3 at 44.) Doing so, Newsome again performed her gatekeeper role. Though that second infection caused FCJ staff to take Plaintiff to the hospital three days later, nothing shows that Newsome was made aware of a worsening of his condition. From

Plaintiff's initial NEF, Newsome would have known only that Plaintiff "popped" and "washed" the infection on his arm, which he regarded as "less serious than [his] last." (*Id.*)  These facts do not support an inference that Newsome "knew about and disregarded" a substantial risk to Plaintiff's health. *Mata*, 427 F.3d at 752.  After all, "most skin conditions are not intuitively serious." *Stepnay v. Goff*, 164 F. App'x 767, 770 (10th Cir. 2006).

Though Plaintiff made other requests for treatment or medications, moreover, Plaintiff made these requests either orally or by ICF, not by NEF. (*See, e.g.*, Doc. 20-2 at 9, 20, 25, 28–29; Doc 20-3 at 21.)  Under the FCJ's policies, FCJ staff would not *necessarily* have redirected these requests to Newsome.  And nothing in Plaintiff's complaint or the *Martinez* report shows that Newsome actually received any of these non-NEF requests.  It is reasonable, therefore, to infer that Newsome never "knew about and disregarded" these particular requests.[6] *Mata*, 427 F.3d at 752 ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [s]he must also draw the inference.").

### 2. Defendants Bascue, Welch, & Lawson—Individual Capacity (Supervisory Liability) — And —
### 3. All Defendants—Official Capacity (Municipal Liability)

Here, where Plaintiff alleges no "direct participation" by Defendants Bascue, Welch, and Lawson in the complained-of care, these Defendants' individual liability instead turns on their actions as supervisors. *Id.*  Because a municipality, like Finney County, "is a 'person' subject to § 1983 liability," *Burke v. Regalado*, 935 F.3d 960, 998 (10th Cir. 2019), who acts only through its officers or agents,

---

[6] Still, these requests were not wholly ignored.  FCJ staff responded to Plaintiff's June 18 concerns about contemplating harm to others or himself by immediately removing him to a booking cell for closer monitoring under a 15-minute watch. And FCJ staff, like Newsome, responded to Plaintiff's medication requests by advising him that FCJ staff do not leave the jail to pick up prescriptions; instead, the jail uses pharmacies to deliver prescriptions to the jail.

moreover, claims against Newsome, Bascue, Welch, and Lawson in their official capacity are "the same as a suit against the municipality." *Patel v. Hall*, 849 F.3d 970, 978 (10th Cir. 2017). "The elements for supervisory and municipal liability are [essentially] the same in this case." *Burke*, 935 F.3d at 999. Both require Plaintiff to demonstrate: (1) an "official policy or custom[,] (2) causation, and (3) state of mind." *Id.* at 997–99. Plaintiff may satisfy the "official policy or custom" showing by pleading particular facts specifying either "a formally promulgated policy, a well-settled custom or practice, a final decision by a municipal policymaker, or deliberately indifferent training or supervision." *Id.* at 999. To hold Bascue, Welch, and Lawson individually liable, Plaintiff must also show "personal involvement." *Id.* at 997. Bascue, Welch, and Lawson must have "promulgated, created, implemented or possessed responsibility for the continued operation" of the offending policy or custom. *Id.*

Returning to Plaintiff's complaint, Plaintiff alleges Bascue, Welch, and Lawson "maintained a number of official and unofficial practices, policies, or customs . . . which were the moving force behind Newsome's unconstitutional medical care," including:

> failure to hire additional medical staff to spread the workload of Newsome . . . ; failure to properly investigate reports of deficiencies in the care provided by Newsome; failure to discipline Newsome for negligence and deliberate indifference to inmates serious medical needs; failure to properly monitor the jail to ensure inmate's serious medical needs were met; and failure to train security staff to refuse to attempt to make medical diagnoses for which they have no training or qualifications.

(Doc. 1 at 5.) "The number and volume of complaints about deficiencies in [the] F.C.J.'s medical care," according to Plaintiff, "indicate Defendants approved of, or at least knowingly acquiesced in, Newsome's deprival of inmate's medical care." (*Id.*)

These overly general and conclusory allegations are problematic. *See Hall*, 935 F.2d at 1110 ("[T]he court need accept as true only [Plaintiff's] well-pleaded factual contentions, not his conclusory allegations.").

First, supervisory liability requires "personal involvement." *Burke*, 935 F.3d at 997. Allegations of the type that defendants "failed to properly supervise . . . staff and [did] nothing after learning of [the complained-of action]" are unacceptable "naked assertions devoid of further factual enhancement." *Peterson v. Creany*, 680 F. App'x 692, 696 (10th Cir. 2017). Plaintiff must "identify *specific* actions taken by *particular* defendants." *Pahls*, 718 F.3d 1210, 1226 (10th Cir. 2013) (emphasis in original). This includes differentiating the "different powers and duties" Bascue, Welch, and Lawson possessed with respect to each challenged policy, to "make clear exactly *who* is alleged to have done *what*." *Id.* at 1225–26 (emphasis in original). Without these details, Plaintiff shows no "affirmative link" between the harm he claims and Bascue's, Welch's, or Lawson's own actions. *See Burke*, 935 F.3d at 997 (explaining that proving "personal involvement" requires some "affirmative link between the supervisor and the constitutional violation.").

As to the necessary "state of mind" showing, Plaintiff's allegations again lack necessary detail. Plaintiff's right to individual-capacity relief depends, in part, on whether Bascue, Welch, and Lawson knew that policies within their control would "almost inevitably result in injury of the type experienced by [Plaintiff]." *Id.* at 997–98. Plaintiff's right to official-capacity relief depends, in part, on whether Finney County had "actual or constructive notice" that its action or inaction was "substantially certain to result" in a deprivation of Plaintiff's right to medical care, "and it consciously or deliberately [chose] to disregard the risk of [that] harm." *Dawson v. Bd. of Cty. Com'rs of Jefferson Cty.*, 732 F. App'x 624, 628 n.5 (10th Cir. 2018). Plaintiff alleges that, over "several years," "inmates," "family and friends of inmates," and "F.C.J. staff" filed "[n]umerous complaints" regarding "deficiencies in F.C.J.'s medical care." (Doc. 1 at 5.) Whether these numerous complaints made the risk of constitutional harm "known or obvious" to Bascue, Welch, Lawson, or, by some other means, Finney County, however, depends on details missing from Plaintiff's complaint, like: when these complaints were made, what particular

"deficiencies" these complaints identified, and to whom these complaints were communicated. *Burke*, 935 F.3d at 997–98; *see also Vega v. Davis*, 572 F. App'x 611, 618 (10th Cir. 2016) ("The mere presence of records, by themselves, does not create the reasonable inference that [the warden] read them. The plaintiff fails to explain why it is reasonable to infer that a warden would review all of the records of each inmate, . . . or [decedent-plaintiff's] records in particular."). The court cannot infer that Bascue, Welch, Lawson, or Finney County disregarded a known or obvious risk without these particulars.

Also missing for most all of Plaintiff's deliberate-indifference theories is any plausible showing that Defendants caused a constitutional harm. The complained-of constitutional harm underlying Plaintiff's supervisory-liability claims is "Newsome's unconstitutional medical care." (Doc. 1 at 5.) But the court has already determined that Plaintiff received constitutionally acceptable care from Newsome as an individual—at least based on the facts as alleged in Plaintiff's complaint and established through the *Martinez* report. As such, the court can infer no harm to Plaintiff from any failure to investigate or discipline alleged deficiencies in Newsome's care.

Affording Plaintiff's complaint a liberal reading, the only questions outstanding are: did Plaintiff suffer constitutional harm from delays caused by the FCJ's prescription policy, its use of nonmedical personnel to initially assess whether an inmate is undergoing a medical emergency, and its reliance on a single nurse to provide on-site medical care for all FCJ inmates?

As to medication delays attributable to the FCJ's prescription policy, neither Plaintiff's allegations nor the *Martinez* report shows that Plaintiff suffered "unnecessary pain or a worsening of [his mental health] condition" from the delay. *Mata*, 427 F.3d at 755. Plaintiff's complaint alleges no harm whatsoever. And the only worsening of Plaintiff's mental health condition demonstrated by the *Martinez* report—Plaintiff's temporary placement under 15-minute watch for expressed thoughts of

harming himself or others—occurred on June 18, prior to and apart from the July and September pharmacy-caused medication delays.

As to the FCJ's emergency policy, use of medically untrained staff, and alleged overreliance on a single nurse, the court must look closer at the actions FCJ staff took in Newsome's absence and under the FCJ's policies. Uncontroverted facts show that in all instances but one, either Newsome or FCJ staff timely addressed Plaintiff's MRSA-based requests for care.[7] Existing facts viewed in Plaintiff's favor, however, suggest that Newsome's unavailability and an overreliance on medically untrained FCJ staff plausibly caused Plaintiff "unnecessary pain or a worsening of [his MRSA] condition," *Mata*, 427 F.3d at 755, in only one instance: the three-day delay between Plaintiff's July 13 request for "emergency aid & treatment" and his July 16 trip to the hospital. (Doc. 20-3 at 43.) At the start of those three days, Plaintiff complained that his infection was causing "blood & pus secretions, severe headaches, high blood pressure, pain in chest right of sternum." (*Id.*) FCJ properly forwarded this complaint but did nothing else over the weekend to address Plaintiff's further requests for treatment. It seems that, upon inspection, FCJ staff deemed Plaintiff's infection to be nothing more than "either an ingrown hair or a pimple." (Doc. 20-2 at 9.) If credited, that assessment would not meet the FCJ medical emergency policy's threshold for affording Plaintiff emergency medical care—i.e., Plaintiff's condition was neither life-threatening nor one that "need[ed] to be treated as soon as possible." (Doc. 20-1 at 35.) And if credited, even though ultimately inaccurate, that assessment would tend to show that the seriousness of Plaintiff's medical condition was nonobvious—meaning FCJ staff lacked a culpable mindset when they

---

[7] For example, after Plaintiff's July 16 hospital visit, Newsome daily cared for Plaintiff until his first MRSA infection healed. She also acted on the antibiotics request Plaintiff made for his second MRSA infection. As Plaintiff was under Newsome's care on these occasions, FCJ was "generally justified in believing that [Plaintiff was] in capable hands." *Giles v. Godinez*, 914 F.3d 1040, 1049–50 (7th Cir. 2019). When Plaintiff made it clear to FCJ staff that his second infection was worsening, staff promptly transported Plaintiff to the hospital.

did nothing to arrange earlier care for Plaintiff's medical needs. *See Mata*, 427 F.3d at 753 ("[T]he symptoms displayed are relevant . . . to the subjective component of the [deliberate-indifference] test: were the symptoms such that a prison employee knew the risk to the prisoner and chose (recklessly) to disregard it?"); *Stepnay*, 164 F. App'x at 770 ("[M]ost skin conditions are not intuitively serious.").

Credit-worthy or not, however, fact issues remain. Given the severity of Plaintiff's claimed symptoms; the alleged pain he endured awaiting care; and the fact that, once available, someone with medical training ultimately ordered him taken to the hospital; fact issues remain as to both the FCJ staff's mindset and the impact the complained-of policies had during the July 13–16 delay in care.

\*\*\*

To summarize, Plaintiff lacks well-pleaded allegations showing any constitutional harm caused by Newsome; personal involvement in that harm by Bascue, Welch, and Lawson; and that any named Defendant acted with a culpable mindset. As such, Plaintiff's complaint states no plausible deliberate indifference claims. Because these important elements missing from Plaintiff's complaint "may not have occurred to him" but may be supplied through "an opportunity to amend," however, the court denies Defendants' motion to dismiss Plaintiff's deliberate indifference claims. *Hall*, 935 F.2d at 1110. Plaintiff is ordered to file an amended complaint within 30 days of the date of this order. Dismissal of these claims will occur if Plaintiff fails to file an amended complaint. If Plaintiff does file an amended complaint, Defendants may again move for dismissal.

**B. Count II: Excessive Force**

Plaintiff also claims that all Defendants but Newsome denied him the opportunity "to shower to relieve the burning effects" he experienced from the pepper spray used against him during the July 14 disturbance. (Doc. 1 at 6.) As an initial matter, Defendants argue that Plaintiff's claim is barred by his failure to exhaust administrative remedies. Defendants are correct.

A pretrial detainee, like Plaintiff, can sue over prison conditions—including excessive force—only after exhausting all administrative remedies available at the time he filed his suit. *See* 42 U.S.C. § 1997e(a), (h); *Porter v. Nussle*, 534 U.S. 516, 532 (2002) ("[W]e hold that the PLRA's exhaustion requirement applies to all inmate suits about . . . excessive force or some other wrong."); *Norton v. Marietta*, 432 F.3d 1145, 1150–51 (10th Cir. 2005) (agreeing that "the plaintiff's status at the time he files suit determines whether §1997e(a)'s exhaustion provision applies."). Here, the FCJ's grievance procedures "define the boundaries of proper exhaustion." *Jones v. Bock*, 549 U.S. 199, 218 (2007). Those procedures required Plaintiff to, among other acts, "file a grievance. . . submitted on an inmate communication form." (Doc. 20-1 at 10.) While Plaintiff submitted numerous ICFs, none grieve Defendants' use of pepper spray or refusal to permit him a shower to decontaminate.

***

Accordingly, this unexhausted claim, for which amendment would be futile, is dismissed. *See Jones*, 549 U.S. at 221 (adopting for § 1997e(a) the general rule that "if a complaint contains both good and bad claims, the court proceeds with the good and leaves the bad."); *Kay*, 500 F.3d at 1217 ("Dismissal of a pro se complaint for failure to state a claim is proper only where it is obvious that the plaintiff cannot prevail on the facts he has alleged and it would be futile to give him an opportunity to amend.")

### C. Count III: Access to the Courts and Counsel

Plaintiff finally claims that all Defendants but Newsome violated his constitutional rights when "Admin. refused" multiple ICF requests he made to call his defense attorney and purchase correspondence materials "necessary to communicate with the courts and attorneys about his defense for his pending criminal case or seeking injunctive relief for civil rights violations." (Doc. 1 at 7.) This

claim implicates two constitutional concerns, Plaintiff's right to access the courts and his right to defense counsel.[8]

Initially, any claim based on an interference with Plaintiff's Sixth Amendment right to counsel fails. To the extent Plaintiff's "right-to-counsel claim implies the invalidity of his [state-court] conviction by alleging that the 'restrictions [on his confinement] adversely affected his ability to prepare a defense,' the claim is barred by *Heck v. Humphrey*, 512 U.S. 477 (1994)." *Aurelio v. Joyce*, 683 F. App'x 731, 735 (10th Cir. 2017) ("Under *Heck*, a plaintiff may 'not bring a civil-rights claim for damages under § 1983 based on actions whose unlawfulness would render an existing criminal conviction invalid.'"); *see also Williams v. Taylor*, No. 18-cv-2933, 2019 WL 2357041, at *2–*3 (N.D. Ill. June 4, 2019) (citing various cases for the proposition that "it appears well-established that any Sixth Amendment claim—especially those asserting that a prisoner was denied access to counsel—necessarily implicates the validity of any underlying conviction in state court and is therefore *Heck*-barred."). "Consequently, the claim is not cognizable in this litigation, but may be asserted in a petition for a writ of habeas corpus on Sixth Amendment grounds."[9] *Valdez v. Rosenbaum*, 302 F.3d 1039, 1049 (10th Cir. 2002).

Plaintiff's court-access claim fairs no better on an initial reading of Plaintiff's complaint. "[D]etainees," like Plaintiff, "are entitled to meaningful, but not total or unlimited, access to the courts."

---

[8] Count III of Plaintiff's complaint also invokes "his inalienable right[] to . . . equal protection of the laws." (Doc. 1 at 7.) But any equal protection claim is entirely too underdeveloped for review.

[9] Even assuming otherwise, Plaintiff's complaint lacks necessary allegations. Plaintiff's right to have counsel assist him in his criminal defense "does not require in all instances full and unfettered [attorney-client] contact." *Mann v. Reynolds*, 46 F.3d 1055, 1060 (10th Cir. 1995). To show an interference with his Sixth Amendment right to counsel, Plaintiff must show "some adverse effect upon the effectiveness of [his] counsel's representation or . . . some other prejudice to [his] defense." *Aurelio*, 683 F. App'x at 734–35 (quoting *United States v. Morrison*, 449 U.S. 361, 365 (1981)). Here, Plaintiff alleges no such harm, making his claim dismissal-worthy. *Id.* (rejecting general allegation that defendants "'caused [plaintiff] to be placed in solitary confinement without phone privileges so he could [not] talk to his attorney[,]' . . . thereby 'adversely affect[ing] his ability to prepare a defense.'")

*Peoples v. CCA Det. Ctrs.*, 422 F.3d 1090, 1107 (10th Cir. 2005). To show a violation of his right to access the courts, Plaintiff "must demonstrate actual injury from interference with his access to the courts"—meaning, Defendants "frustrated or impeded his efforts to pursue a nonfrivolous legal claim concerning his conviction or his conditions of confinement." *Gee v. Pacheco*, 627 F.3d 1178, 1191 (10th Cir. 2010) (citing *Lewis v. Casey*, 518 U.S. 343, 351–55 (1996)). But here, Plaintiff identifies neither a nonfrivolous claim nor filing that the restrictions he faced while in disciplinary segregation frustrated or impeded. Instead, he alleges the sort of vague and overbroad allegations that courts have dismissed. *See id.* (rejecting "vague and conclusory" allegations that defendants "engaged in confiscating, reviewing, and hindering access to [plaintiff's] legal files, hindering his communications with a jailhouse lawyer, denying him access to a law library, and interfering with his legal mail.").

Plaintiff's complaint gains no added support from the *Martinez* report's uncontroverted facts. The *Martinez* report shows only one filing that Plaintiff hoped to make: a pro se action "to seek relief for violations of [his] Civil Rights." (Doc. 20-2 at 33.) Plaintiff accomplished that objective on September 14, 2018, when he filed this action. *See Tijerina v. Patterson*, 543 F. App'x 771, 774 (10th Cir. 2013) ("[Plaintiff] failed to show an actual injury resulting from the defendant's refusal to provide him with more . . . paper" because, notwithstanding the prison's denial of additional paper, the plaintiff filed the intended brief). If the restrictions Plaintiff faced while under disciplinary segregation injured him in any way, Plaintiff must plead particular facts showing as much.[10]

---

[10] The court pauses here to note that pleading an infringement of Plaintiff's constitutional rights would not end the court's inquiry. "[A] prison regulation impinging on inmates' constitutional rights 'is valid if it is reasonably related to legitimate penological interests.'" *Lewis*, 518 U.S. at 361; *see also Bell v. Wolfish*, 441 U.S. 520, 547 (1979) ("[E]ven when an institutional restriction infringes a specific constitutional guarantee, . . . the practice must be evaluated in light of the central objective of prison administration, safeguarding institutional security."); *Procunier v. Martinez*, 416 U.S. 396, 419 (1974) ("[I]nmates must have a reasonable opportunity to seek and receive the assistance of attorneys. Regulations and practices that unjustifiably obstruct the availability of professional representation or other aspects of the right of access to the courts are invalid."), *overruled in part on other grounds by Thornburgh v. Abbott*, 490 U.S. 401 (1989). "[S]o long as [delays in receiving legal materials or legal assistance] are the product of prison regulations reasonably related to legitimate penological

In addition to alleging no plausible injury, Plaintiff alleges none of the factual details required to impose liability on Defendants Bascue, Welch, Lawson, and Finney County.

Again, Plaintiff may hold Bascue, Welch, and Lawson individually liable only for their "own individual actions." *Pahls*, 718 F.3d at 1225. Plaintiff must first show that Bascue, Welch, and Lawson either: (1) directly participated in any of the complained-of decisions refusing Plaintiff's requests for phone call or commissary access, or (2) personally "promulgated, created, implemented or possessed responsibility for the continued operation" of a policy or custom that denied Plaintiff attorney calls or commissary access. *Id.*; *see also Burke*, 935 F.3d at 997. Plaintiff must "identify *specific* actions taken by *particular* defendants." *Pahls*, 718 F.3d at 1226 (emphasis in original). This includes differentiating the "different powers and duties" Bascue, Welch, and Lawson possessed with respect to any challenged policy, to "make clear exactly *who* is alleged to have done *what*." *Id.* at 1225–26 (emphasis in original). Without these details, Plaintiff shows no "affirmative link" between the harm he claims and Bascue's, Welch's, or Lawson's own actions. *See Burke*, 935 F.3d at 997 (explaining that proving "personal involvement" requires some "affirmative link between the supervisor and the constitutional violation."). Then, Plaintiff must also show "causation" and "state of mind." *Id.* Causation depends on facts showing that Bascue's, Welch's, and Lawson's alleged actions "set[] in motion a series of events" resulting in Plaintiff's lost access to the courts. *Id.* And to show a culpable state of mind, Plaintiff must allege that Bascue, Welch, and Lawson acted with more than "mere negligence." *Simkins v. Bruce*, 406 F.3d 1239, 1242 (10th Cir. 2005) ("[W]hen access to courts is impeded by mere negligence, . . . no constitutional violation occurs.").

---

interests, such delays are not of constitutional significance, even where they result in actual injury." *Lewis*, 518 U.S. at 362. Undertaking this inquiry here, however, would be premature. As currently pleaded, Plaintiff's complaint alleges no actual injury. And as currently argued, neither party directly addresses this standard.

To hold Finney County liable,[11] Plaintiff must demonstrate that "*deliberate* action attributable to [Finney County] directly caused" a deprivation of his right to access the courts. *Bd. of Cnty. Com'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 404, 415 (1997) (emphasis in original). This means Plaintiff must show through nonconclusory factual allegations: (1) an "official policy or custom[,] (2) causation, and (3) state of mind." *Burke*, 935 F.3d at 998; *see also Hall*, 935 F.2d at 1110 ("[T]he court need accept as true only [Plaintiff's] well-pleaded factual contentions, not his conclusory allegations."). Plaintiff may satisfy the first showing by pleading particular facts specifying either "a formally promulgated policy, a well-settled custom or practice, a final decision by a municipal policymaker, or deliberately indifferent training or supervision." *Burke*, 935 F.3d at 999. Plaintiff pleads the second element—"a direct causal link"—by alleging facts showing that Finney County's deliberate conduct "was the 'moving force' behind" his alleged harm. *Brown*, 520 U.S. at 404. Then, Plaintiff must also show that Finney County acted "with deliberate indifference to an almost inevitable constitutional injury"—meaning Finney County had "actual or constructive notice" that its action or inaction was "substantially certain to result" in a deprivation of Plaintiff's right of access to the courts, "and it consciously or deliberately [chose] to disregard the risk of [that] harm." *Dawson*, 732 F. App'x at 628 n.5.

\*\*\*

Lacking well-pleaded allegations showing any actual injury caused by the restrictions he faced while under disciplinary segregation; personal involvement in those restrictions by Bascue, Welch, and Lawson; and that Defendants acted with a culpable mindset, Plaintiff's complaint still states no plausible claim that Defendants denied him access to the courts. Because these important elements missing from Plaintiff's complaint "may not have occurred to him" but may be supplied through "an opportunity to

---

[11] Here too, claims against Bascue, Welch, and Lawson in their official capacity are "the same as a suit against" Finney County. *Patel*, 849 F.3d at 978.

amend," however, the court denies Defendants' motion to dismiss Plaintiff's court-access claims. *Hall*, 935 F.2d at 1110.  Plaintiff is ordered to file an amended complaint within 30 days of the date of this order.  Dismissal of these claims will occur if Plaintiff fails to file an amended complaint.  If Plaintiff does file an amended complaint, Defendants may again move for dismissal.

## IV.    Conclusion

For the reasons stated above, Defendants' Motion to Dismiss (Doc. 21) is DENIED in part and GRANTED in part.  Defendants' motion is granted as to Count II, Plaintiff's excessive force claims; those claims are dismissed without prejudice.  Defendants' motion is denied, however, as to Counts I and III, Plaintiff's deliberate indifference and court-access claims.[12]  Plaintiff will have 30 days from the date of this order to file an amended complaint.[13]  Plaintiff must limit his amended complaint to allegations concerning only his already-raised deliberate indifference and court-access claims.  Plaintiff's amended complaint must cure the deficiencies outlined above.  Failure to file an amended complaint will result in the court dismissing Plaintiff's claims.  If and once Plaintiff files an amended complaint, however, Defendants may renew their motion to dismiss.

---

[12] The court recognizes that Defendants also urge dismissal on the qualified immunity basis that "[e]xisting precedent, particularized to the facts of this case, does not establish that Sheriff Bascue, Welch, Lawson, Newsome, or other FCJ staff violated [Plaintiff's] clearly established right[s]." (Doc. 21 at 19.)  Any amended pleading Plaintiff might file, however, may alter this case's particular facts.  As such, until Plaintiff files an amended complaint that states a plausible constitutional violation, the court will reserve ruling on Defendants' position that their actions violated no clearly established law.

[13] An amended complaint is not simply an addendum to the original complaint, and instead completely supersedes it. Therefore, any claims or allegations not included in the amended complaint are no longer before the court.  Plaintiff's amended complaint may not simply refer to an earlier pleading.  Rather, it must contain all allegations and claims that Plaintiff intends to pursue moving forward in this action, including those from the original complaint not already dismissed.  If not using a court-provided form, Plaintiff must write the number of this case (18-3239-JWB-GEB) at the top of the first page of his amended complaint, and he must name every defendant in the caption of the amended complaint. *See* Fed. R. Civ. P. 10(a).  Plaintiff should also refer to each defendant again in the body of the complaint.  There, to show that Defendants bear liability for a federal constitutional violation, Plaintiff must allege facts describing the unconstitutional acts taken by each defendant, including dates, locations, and circumstances. *See Nasious v. Two Unknown B.I.C.E. Agents*, 492 F.3d 1158, 1163 (10th Cir. 2007) ("[T]o state a claim in federal court, a complaint must explain what each defendant did to [the pro se plaintiff]; when the defendant did it; how the defendant's action harmed [the plaintiff]; and, what specific legal right the plaintiff believes the defendant violated.").

**IT IS SO ORDERED** this 27th day of March 2020.

___s/ John W. Broomes_____
JOHN W. BROOMES
UNITED STATES DISTRICT JUDGE